TODD BLANCHE
Acting Attorney General
JENNIFER L. WAIER
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515
Chief Assistant United States Attorney &
Chief, Criminal Division
JASON C. PANG (Cal. Bar No. 325345)
NISHA CHANDRAN (Cal. Bar No. 325345)
DAVID C. LACHMAN (Cal. Bar No. 261711)
Assistant United States Attorneys
Transnational and Organized Crime/Major Frauds Sections
1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-2654/2429/5564
E-mail: jason.pang@usdoj.gov
nisha.chandran@usdoj.gov
david.lachman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

PAUL A. BILZERIAN, et al.,

Defendants.

No. CR 24-569-MCS-1

GOVERNMENT'S OPPOSITION TO DEFENDANT PAUL A. BILZERIAN'S MOTION TO DISMISS INDICTMENT

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Jason C. Pang, Nisha Chandran, and David C. Lachman, hereby files its opposition to defendant PAUL A. BILZERIAN's motion the Indictment (Dkt. 148).

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 17, 2026

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

JENNIFER L. WAIER
Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515
Chief Assistant United States Attorney & Chief, Criminal Division

/s/
JASON C. PANG
NISHA CHANDRAN
DAVID C. LACHMAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS


DESCRIPTION PAGE

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

A. The Indictment, Charges, and Procedural Posture ........ 2

B. The Government Diligently Pursued Defendant's Presence ........ 3

1. The Government Sought Defendant's Voluntary Return ........ 4

2. When Voluntary Return Failed, the Government Obtained a Red Notice and Assessed Extradition Under a New St. Kitts Law ........ 5

3. The Government Sought Defendant's Extradition from St. Kitts ........ 6

C. Defendant Has a Long History of Deceptive Conduct and Evasion of Judgments ........ 8

III. ARGUMENT ........ 9

A. There Is No Speedy Trial Act Violation ........ 9

B. There is No Violation of Defendant's Sixth Amendment Speedy Trial Right ........ 10

1. The Length of the Delay Establishes Only That Further Inquiry Is Warranted ........ 11

2. The Reasons for Delay Weigh Against Defendant ........ 11

3. Defendant Did Not Genuinely Assert His Speedy Trial Right ........ 15

4. Defendant Cannot Show Prejudice ........ 16

IV. CONCLUSION ........ 19

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

**Cases**

*Barker v. Wingo*, 407 U.S. 514 (1972) .......... 10, 11, 16

*Doggett v. United States,* 505 U.S. 647 (1992) .......... passim

*In re Bilzerian*, 153 F.3d 1278 (11th Cir. 1998) .......... 8

*In re Bilzerian*, 276 B.R. 285 (M.D. Fla. 2002) .......... 8

*In re Kashamu*, 769 F.3d 490 (7th Cir. 2014) .......... 13

*Molinaro v. New Jersey*, 396 U.S. 365 (1970) .......... 10

*SEC v. Bilzerian*, 112 F. Supp. 2d 28 (D.D.C. 2000) .......... 8

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994) .......... 8

*SEC v. Bilzerian*, 613 F. Supp. 2d 66 (D.D.C. 2009) .......... 9

*SEC v. Bilzerian*, 75 F. App'x 3 (D.C. Cir. 2003) .......... 8

*SEC v. Bilzerian*, No. 24-cv-7331-VM (S.D.N.Y. Sept. 27, 2024) .......... 3

*SEC v. Bilzerian*, No. 89-cv-1854-RCL (D.D.C. June 29, 1989) .......... 6, 9

*United States v. Aguirre*, 994 F.2d 1454 (9th Cir. 1993) .......... 12, 17

*United States v. Alexander*, 817 F.3d 1178 (9th Cir. 2016) .......... 13

*United States v. Bardakova*, 145 F.4th 231 (2d Cir. 2025) .......... 10

*United States v. Beamon*, 992 F.2d 1009 (9th Cir. 1993) .......... 11

*United States v. Bilzerian*, 926 F.2d 1285, 1289 (2d Cir. 1991) .......... 8

*United States v. Chin*, No. 22-00087, 2022 WL 17832915, (S.D. W. Va. Dec. 21, 2022) 9

*United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007) .......... 13, 17

*United States v. Diaz Gonzalez*, No. 24-3951, 2025 WL 1794114 (9th Cir. June 30, 2025) .......... 17

*United States v. Espinoza-Ruelas*, 753 F. Supp. 3d 830 (N.D. Cal. 2024) .......... 14, 17

## TABLE OF AUTHORITIES

*United States v. Flores-Vasquez*, 799 F. Supp. 3d 927 (N.D. Cal. 2025) .................. 14, 17

*United States v. Gonzalez-Martinez*, 634 F. Supp. 3d 853 (E.D. Cal. 2022) ............ 14, 17

*United States v. Gregory*, 322 F.3d 1157 (9th Cir. 2003) ........................................ 11, 18

*United States v. Krug*, 666 F. App'x 665 (9th Cir. 2016)............................................. 17

*United States v. Layfield*, 96 F.4th 1095 (9th Cir. 2024)................................................. 9

*United States v. Loud Hawk*, 474 U.S. 302 (1986)........................................................ 16

*United States v. Manning*, 56 F.3d 1188 (9th Cir. 1995).......................................... 15, 18

*United States v. Mendoza*, 530 F.3d 758 (9th Cir. 2008) ..............................10, 12, 13, 17

*United States v. Myers*, 930 F.3d 1113 (9th Cir. 2019) ..........................................passim

*United States v. Olmos*, No. 22-20426, 2025 WL 2466035 (E.D. Mich. Aug. 26, 2025)..9

*United States v. Rees*, 957 F.3d 761 (7th Cir. 2020) ..................................................... 19

*United States v. Salzmann*, 548 F.2d 395 (2d Cir. 1978)............................................... 14

*United States v. Sandoval*, 990 F.2d 481 (9th Cir. 1993) ............................................... 15

*United States v. Shell*, 974 F.2d 1035 (9th Cir. 1992) ........................................... 13, 17

*United States v. Tanh Huu Lam*, 251 F.3d 852 (9th Cir. 2001)................................ 16, 18

*United States v. Xue Cheng Dong*, 539 F. App'x 753 (9th Cir. 2013) ............................ 17

**Statutes**

18 U.S.C. § 3161 .......................................................................................................... 1, 9

**Rules**

Fed. R. Crim. P. 5......................................................................................................... 9, 15

Fed. R. Crim. P. 9............................................................................................................ 15

**Constitutional Provisions**

U.S. Const. amend. VI ..................................................................................................... 10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant Paul Bilzerian ("defendant"), a dual St. Kitts and Armenian national currently resisting extradition, was indicted in September 2024 for conspiring to defraud the United States and to commit wire and securities fraud. He now moves to dismiss the indictment on the ground that the delay in bringing him to trial violated the Speedy Trial Act and his Sixth Amendment right to a speedy trial. (Dkt. 148.) The delay, however, is his own doing. The record reflects his gamesmanship, not a genuine intent to appear for trial.

In January 2019, at the outset of the charged conspiracy, defendant renounced his U.S. citizenship and expatriated to the Federation of St. Kitts and Nevis ("St. Kitts"). Within weeks of his September 2024 indictment, the government moved to secure his return—first pursuing his voluntary appearance, then turning to extradition when that failed. Through counsel, defendant professed a willingness to appear, but conditioned his appearance on terms, including demanding that the government agree in advance to releasing him on his own recognizance and to letting him travel to and from St. Kitts at will. When he moved in October 2025 to compel the government to obtain a visa for him, the government responded that it would facilitate his appearance. Defendant ignored the offer and instead filed this motion to dismiss. And in March 2026, when the government offered to bring him into the United States without a visa, he refused, responding that he would not appear unless this motion were denied and affirmed on appeal. That same month, he was provisionally arrested in St. Kitts, where he now litigates to resist his extradition to the United States.

Neither speedy-trial claim has merit. His statutory claim fails at the threshold: the Speedy Trial Act's seventy-day clock does not begin until a defendant appears before a judicial officer in the district where the charges are pending, *see* 18 U.S.C. § 3161(c)(1), and defendant has never appeared. The constitutional claim also fails. The delay is defendant's own doing: the government diligently pursued his appearance, while he

refused to appear except on his own terms, spurned its offer to facilitate his entry into the United States, and now fights the extradition that would bring him to trial. He never genuinely asserted the right, demanding a speedy trial in the same breath as he refused to attend one. And he shows no prejudice—no lost witness, no faded memory, no missing evidence—in a case built on preserved records. And even if the government were responsible for the entire delay—it was not—the time falls far short of the range that the Ninth Circuit has found would excuse defendant from showing particularized prejudice.

Defendant's professed desire to face the charges cannot be squared with his conduct. For more than three decades, federal courts have found that he evades their judgments and misleads courts and regulators—about his finances and otherwise—a pattern that has continued through this prosecution. A defendant who refuses to appear unless the government accepts his conditions, and then resists extradition, may not invoke the resulting delay as grounds for dismissal. The motion should be denied.

## II. STATEMENT OF FACTS

### A. The Indictment, Charges, and Procedural Posture

On September 26, 2024, a grand jury returned an indictment charging defendant, Scott Rohleder ("Rohleder"), and Ignite International Brands, Ltd. ("Ignite"), and the Court issued a warrant for defendant's arrest. (Dkt. 1; Cherney Decl. ¶ 7.) The government obtained a First Superseding Indictment ("FSI") on September 30, 2025, and the Clerk issued a warrant for defendant's arrest on the FSI the same day. (Dkt. 123.)

The FSI charges defendant with conspiracy to defraud the United States, conspiracy to commit wire and securities fraud, and substantive wire fraud and securities fraud counts. (Dkt. 123 ¶¶ 2, 7 & Counts.) As alleged, defendant concealed his ownership and control of Ignite and funneled money through a series of shell companies to capitalize Ignite while keeping his assets beyond the reach of the SEC, which had been attempting to collect a now-$180 million disgorgement judgment against defendant. (Dkt. 123 ¶¶ 1–2.) The FSI further alleges that defendant, Rohleder, and Ignite defrauded Ignite's investors by misrepresenting the timing and nature of a sale of Ignite's vape

products to another company defendant controlled to inflate Ignite's reported sales. (Dkt. 123 ¶¶ 6–7.)

The SEC filed a parallel civil enforcement action against defendant in the Southern District of New York in or about September 2024. His then-counsel in that action waived service of the civil complaint in October 2024, and defendant has since litigated that action *pro se*. *SEC v. Bilzerian*, No. 24-cv-7331-VM, Dkt. 10 (S.D.N.Y. Oct. 28, 2024).

This is a complex case with voluminous discovery—approximately 1.2 million pages, exceeding 8 terabytes. (Dkts. 27, 98, 120, 170.) Rohleder and Ignite first appeared before a judicial officer in this district on October 28, 2024, and the Speedy Trial Act required that their trial commence by January 6, 2025. Defendant has not made his initial appearance. On the appearing defendants' motions, the Court has continued the trial four times, finding under 18 U.S.C. § 3161(h)(7) that the case is "so unusual and so complex . . . that it is unreasonable to expect adequate preparation" within the Speedy Trial Act's limits. (Dkts. 37, 108, 122, 174.) In seeking those continuances, the appearing defendants represented that additional time was necessary for effective trial preparation, not that the delay would prejudice their defense. (Dkts. 27, 98, 120, 170.) Trial is presently set for October 19, 2026. (Dkt. 174.)

### B. The Government Diligently Pursued Defendant's Presence

Because a federal arrest warrant has no force abroad, the government could secure defendant's presence only through voluntary return or extradition. Defendant had renounced his U.S. citizenship in January 2019 and expatriated to St. Kitts. He had traveled freely into and out of the United States through March 2019 but did not return after his indictment—even though nothing prevented him from surrendering, without a visa, at a U.S. port of entry. (Cherney Decl. ¶¶ 2–3, 5–7 & Exs. 1–2.) The government first pursued voluntary return and, after that failed, extradition.

1. The Government Sought Defendant's Voluntary Return

The government moved to secure defendant's voluntary return within weeks of the indictment. On November 7, 2024, the government wrote to Ashwin J. Ram of Steptoe LLP—who then represented defendant in the parallel SEC civil action and had been corresponding with the government about the criminal case—noting that it had "obtained an arrest warrant, and not a summons" for defendant, stating its understanding based on communications from Mr. Ram that defendant "does not intend to surrender himself pursuant to the warrant," and asking counsel to advise "if that position has changed." (Pang Decl. ¶ 3; Ex. 1.) Ram responded on November 12, 2024, that "Paul Bilzerian has authorized us to send you an email," and that defendant "wishes to face the U.S. charges head on." Counsel asked the government to "stipulate to terms of release on his own recognizance (OR), permitting continued residence in St. Kitts, and permitting unrestricted travel both within and for entering/exiting the United States," which, the email stated, "will require the United States to provide Paul with a standard ten-year multiple entry visa." (Pang Decl. ¶ 4; Ex. 2.) Defendant thus professed a willingness to appear but explicitly conditioned it on terms the government was not required to grant.

The government reiterated its interest in defendant's return in February 2025. On February 14, 2025, AUSA Alexander Schwab wrote that, although the government was "not aware of any role [the Office] play[s] in the visa process," it "would obviously welcome Paul Bilzerian returning to the United States to face the charges." The government noted, however, that because the Steptoe attorneys were "not [defendant's] criminal counsel," it could not negotiate bond terms with them. (Pang Decl. ¶ 5; Ex. 3.)

Shortly thereafter, in March 2025, Ronald D. Hedding contacted the government on defendant's behalf to negotiate the conditions of his appearance. On March 19, the government sent Hedding a standard financial-disclosure form to inform any bond determination. (Pang Decl. ¶ 6; Ex. 4.) The next day, Hedding informed the government that defendant would not complete the form, calling the form "irrelevant" and offering a disclosure only "if you commit to O/R or a nominal unsecured bond." (Pang Decl. ¶ 7;

Ex. 5.) The government declined to agree to release terms in advance: on March 27, it responded that it would "not . . . agree to O.R. release or a 'nominal' bond amount in advance," (Pang Decl. ¶ 8; Ex. 6); and on March 28, 2025, it explained that "we want him present at trial—we charged him," while making clear that defendant remained free to argue for bond "if and when he appears in this case and receives his detention hearing." (Pang Decl. ¶ 9; Ex. 7.) The government received no further communications after March 28, 2025 from Hedding seeking to discuss defendant's voluntary return before defendant filed his speedy-trial demand and motion for a visa on October 29, 2025. (Pang Decl. ¶ 10.)

2. When Voluntary Return Failed, the Government Obtained a Red Notice and Assessed Extradition Under a New St. Kitts Law

When defendant's counsel went silent after March 2025, the government also pursued his arrest abroad. On April 3, 2025, it applied for an INTERPOL Red Notice directing member states to locate and provisionally arrest defendant with a view to extradition.[1] (Cherney Decl. ¶ 8.) In May 2025, the government contacted the Department of Justice's Office of International Affairs ("OIA") about extraditing defendant from St. Kitts. (Pang Decl. ¶ 12.) Based on these consultations, the government understood that extradition from St. Kitts would be a lengthy and contested process with uncertain prospects. (*Id.*) On May 22, 2025, St. Kitts repealed its longstanding extradition statute and enacted a new, modernized Extradition Act. (*Id.* ¶ 13.) Once the government learned of the change in law, shortly after its passage, extradition appeared a more feasible path. (*Id.* ¶ 13.) The government proceeded expeditiously to supersede the indictment, evaluate the new law's requirements, and obtain a declaration from a percipient witness. (*Id.* ¶¶ 12-15.)

[1] At the time of the application, INTERPOL Washington advised that publication was subject to a backlog of approximately six months owing to the review conducted by the U.S. National Central Bureau and the INTERPOL Secretariat General. The Red Notice was published on October 27, 2025. (Cherney Decl. ¶ 8.)

3. The Government Sought Defendant's Extradition from St. Kitts

Because the charging instrument submitted with an extradition request defines the offenses on which a defendant may be prosecuted after surrender, the government built its request on the First Superseding Indictment, which it obtained on September 30, 2025. (Dkt. 123; Pang Decl. ¶ 14.) The next day, the government initiated the extradition process with OIA. (Pang Decl. ¶ 14.) On October 27, 2025, INTERPOL published the Red Notice the government had applied for six months earlier. (Cherney Decl. ¶ 8.)

As the government prepared its extradition request, defendant turned to litigation. On October 29, 2025, when counsel representing Rohleder (and both defendant and Rohleder in a related proceeding) asked the government for its position on allowing defendant to testify remotely as a witness at trial, the government responded that if defendant "is willing to make himself available at trial, the government is happy to facilitate his transportation to the United States for his personal appearance at trial."[2] Defendant did not take up that offer. (Pang Decl. ¶ 10; Ex. 8.) Instead, that same day, defendant filed a notice of appearance, speedy trial demand, and motion to compel the government to obtain him a visa (Dkt. 141); his co-defendants moved to present defendant's testimony by video as an unavailable witness (Dkt. 135); and on November 11, defendant filed the present motion to dismiss. (Dkt. 148.) In a November 12 filing served on defendant via ECF, the government reiterated that it "remain[ed] willing to promptly facilitate defendant's admission into the United States, as it would with any other defendant located abroad." (Dkt. 145 ¶ 50.)

[2] The government conveyed its offer through David I. Schoen. Although Schoen is criminal counsel for co-defendant Rohleder in this case, he simultaneously represents defendant and Rohleder in a related proceeding before the U.S. District Court for the District of Columbia. Schoen entered his appearance for defendant in that matter on August 20, 2025, to file a motion under Federal Rule of Civil Procedure 60(b) for relief from the SEC judgment that is the subject of the criminal case. *SEC v. Bilzerian*, No. 89-cv-1854-RCL (D.D.C.), Dkts. 1284, 1285. The court denied the motion on November 18, 2025. *Id.*, Dkt. 1294.

The government's preparation of the extradition request proceeded unabated. It transmitted the complete extradition package to OIA in December 2025 and, through successive rounds of OIA review, revised and advanced it over the following months. (Pang Decl. ¶ 16.)

As the request neared completion, the government made defendant a final offer to facilitate his voluntary return. On March 18, 2026, it wrote: "If you are willing to travel to the United States to be arraigned in the criminal case, the government will facilitate your entry into the country without the need for obtaining a U.S. visa." (*Id.* ¶ 19; Ex. 9.) It identified three specific flights, offered to arrange the requisite travel documents through the U.S. Embassy, and asked whether his "willingness is conditioned on a decision on any pre-trial motions." (*Id.*) Defendant responded that "[i]f my Motion to Dismiss is granted, then there will be no need for me to travel to the United States," and only "[i]f my Motion to Dismiss is denied and affirmed on appeal, and the trial goes forward" would he "need permission to enter the United States." (Pang Decl. ¶ 19; Ex. 10.) Two days later, rather than book a flight, he asked whether "[a]fter I am arraigned in Los Angeles, [I] will ... be allowed to return home to St. Kitts until my trial." (Pang Decl. ¶ 20; Ex. 10.)

The government completed its extradition request in the same period. On March 20, 2026, it transmitted the sworn, final request. (Pang Decl. ¶ 16.) Defendant was provisionally arrested in St. Kitts on March 24, 2026. (*Id.* ¶ 17.) He is now contesting extradition, represented by counsel, and faces new fraud charges in St. Kitts. (*Id.* ¶¶ 17-18.)

Even after the arrest, the government continued to engage. On or about April 24, 2026, through OIA and the St. Kitts authorities, it answered defendant's questions about the voluntary return process and offered to discuss bond in advance—including an agreed amount and a U.S. residence of his choosing—if he provided a complete and accurate financial disclosure under penalty of perjury. Defendant did not respond. (*Id.* ¶ 21; Ex. 11.)

### C. Defendant Has a Long History of Deceptive Conduct and Evasion of Judgments

Defendant's motion rests on his account that he was anxious to appear and was thwarted only by the government. In weighing that account, the Court has the benefit of an extensive record—much of it from judicial opinions—bearing on defendant's credibility and decades-long history of evading judgments.

In 1989, defendant was convicted of nine counts of securities fraud, false statements to the SEC, and conspiracy to defraud the United States. *United States v. Bilzerian*, 926 F.2d 1285, 1289, 1302 (2d Cir. 1991). In the SEC's ensuing civil action, he was ordered to disgorge more than $33 million in unlawful profits and more than $29 million in prejudgment interest. *SEC v. Bilzerian*, 29 F.3d 689, 691 (D.C. Cir. 1994). The D.C. Circuit found that "others were injured by Bilzerian's deceptions," including investors who paid inflated prices for his stocks "because of his illegal actions." *Id.* at 697. With accrued interest, that judgment now exceeds $180 million.

Defendant twice sought to discharge the judgment in bankruptcy, and twice failed. *See In re Bilzerian*, 153 F.3d 1278, 1282 (11th Cir. 1998); *In re Bilzerian*, 276 B.R. 285, 289 (M.D. Fla. 2002). The bankruptcy court found that defendant "made no attempt whatsoever to pay," having instead transferred at least $31 million into "off-shore trusts and family-owned companies and partnerships . . . purposefully to insulate his assets from the reach of his creditors." *In re Bilzerian*, 276 B.R. at 289–90.

His defiance drew repeated findings of civil contempt. In 2000, the court found that he had the means to comply but was focused on "how to avoid compliance," appointed a receiver, and when he still would not comply, ordered him incarcerated until he did. *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 28 (D.D.C. 2000); *SEC v. Bilzerian*, 131 F. Supp. 2d 10, 18 (D.D.C. 2001). After he flooded the court with "frivolous lawsuits . . . calculated to forestall and frustrate the receiver's efforts," the court enjoined him from commencing any proceeding without prior approval, and the D.C. Circuit affirmed. *SEC v. Bilzerian*, 75 F. App'x 3, 4 (D.C. Cir. 2003). The court held him in contempt of that

injunction in 2009 and 2010. *SEC v. Bilzerian*, 613 F. Supp. 2d 66, 69–70 (D.D.C. 2009); *SEC v. Bilzerian*, No. 89-cv-1854-RCL, Dkt. 1092 (D.D.C. July 13, 2010).

The pattern has continued through this prosecution. In January 2025—months after his indictment in this case—the court again held defendant in civil contempt of the standing injunction, finding that he had caused litigation to be commenced in a foreign court, through his son and affiliated entities, in violation of that injunction. *SEC v. Bilzerian*, No. 89-cv-1854-RCL, Dkt. 1256 (D.D.C. Jan. 24, 2025). Across these proceedings, the district court has found that defendant "engage[s] in a pattern of deception and financial maneuverings in order to shield his assets," and that he retains "considerable wealth." *Id.*, Dkts. 651 (Apr. 5, 2002), 1232 (Aug. 26, 2019).

## III. ARGUMENT

### A. There Is No Speedy Trial Act Violation

The Speedy Trial Act requires that a criminal trial "commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, **whichever date last occurs.**" 18 U.S.C. § 3161(c)(1) (emphasis added); *see United States v. Layfield*, 96 F.4th 1095, 1097–98 (9th Cir. 2024); Fed. R. Crim. P. 5 (initial appearance). Because defendant remains in St. Kitts and has not yet appeared before a judicial officer in this district, his statutory clock has not started, and there is no period against which to measure a violation.

Defendant's filing of a "notice of appearance" in October 2025 (Dkt. 141) does not alter the analysis. A filing by an absent defendant is not an appearance "before a judicial officer" and does not start the clock. *See, e.g.*, *United States v. Olmos*, No. 22-20426, 2025 WL 2466035, at *2 (E.D. Mich. Aug. 26, 2025) (notice of appearance did not start the clock); *United States v. Chin*, No. 22-00087, 2022 WL 17832915, at *3 (S.D. W. Va. Dec. 21, 2022) ("The plain language of the Speedy Trial Act requires an appearance before a judicial officer of the charging district, not an appearance by

counsel via filing a motion.”). Defendant’s statutory Speedy Trial claim therefore must be denied.

### B. There is No Violation of Defendant’s Sixth Amendment Speedy Trial Right

The Sixth Amendment guarantees that “[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.” U.S. Const. amend. VI. In determining when that right has been violated, “the Supreme Court has rejected any rigid approaches or clearly defined rules.” *United States v. Myers*, 930 F.3d 1113, 1119 (9th Cir. 2019). Instead, the Court adopted a “balancing test” in which four factors are considered: (1) the length of the delay; (2) the reason for the delay; (3) the extent to which the defendant asserted his right; and (4) whether he suffered prejudice from the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008). No factor is necessary or sufficient on its own; the factors must be balanced through “an ad hoc, case-by-case approach” and “considered together with such other circumstances as may be relevant.” *Myers*, 930 F.3d at 1117, 1120 (quotations omitted); *Barker*, 407 U.S. at 530, 533.

Here, defendant cannot show a constitutional violation. The relatively short delay does no more than open the *Barker* inquiry; the three decisive factors all weigh against him. The government acted with reasonable diligence, the delay is the product of his own gamesmanship, and he has shown no prejudice.[3] During the roughly 18 months between his September 2024 indictment and his March 2026 provisional arrest, the government worked to secure the presence of a defendant it could reach only through voluntary return or a contested foreign extradition; defendant rebuffed its offers and

---

[3] Although the government addresses defendant’s motion on the merits, a defendant who refuses to submit to the court’s jurisdiction may be disentitled from obtaining affirmative relief. *See Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970); *United States v. Bardakova*, 145 F.4th 231, 243–45 (2d Cir. 2025). The government expressly reserves this issue, pending further factual development of defendant’s continuing efforts to resist extradition and avoid appearing in this District.

instead insisted on conditions the government had no obligation to accept. And every day since March 24, 2026—nearly four months as of this filing—defendant has resisted in the courts of St. Kitts the very extradition that would deliver him to trial.

1. The Length of the Delay Establishes Only That Further Inquiry Is Warranted

The first *Barker* factor asks whether the delay "passes a threshold point of 'presumptively prejudicial' delay." *United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir. 1993) (quoting *Doggett v. United States,* 505 U.S. 647, 650 (1992)). In the Ninth Circuit, "courts generally have found that delays approaching one year are presumptively prejudicial." *United States v. Gregory*, 322 F.3d 1157, 1161–62 (9th Cir. 2003). Measured from defendant's September 2024 indictment to the current October 2026 trial date, the delay is roughly twenty-five months—enough to cross that threshold and proceed to the remaining factors.

But crossing that threshold does no more than trigger the inquiry. Despite its label, "presumptive prejudice" in this sense "simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry," *Doggett*, 505 U.S. at 652 n.1, and "cannot alone carry a Sixth Amendment claim," *id.* at 655–56. The strength of the presumption must be weighed against the other *Barker* factors. *See Barker*, 407 U.S. at 533–34; *Gregory*, 322 F.3d at 1161–62. Here, those factors weigh decisively against him.

2. The Reasons for Delay Weigh Against Defendant

Under the second *Barker* factor, a court must "consider the reasons for a delay in context," rather than applying a rigid rule. *Myers*, 930 F.3d at 1121. A "deliberate attempt to delay the trial in order to hamper the defense" weighs heavily against the government; negligence weighs "less heavily," and even then, a court considers "the nature and circumstances of the negligence" rather than charging it to the government automatically. *Id.* at 1119, 1121. A "good-faith, reasonable justification for the delay . . . will weigh less heavily against the government or not weigh against the government at

all." *Id.* at 1119–20. Delay the defendant himself causes weighs against him: "[w]hen a defendant causes a post-indictment delay, the defendant is deemed to have waived the right to a speedy trial" as to that period. *Id.* at 1119. And where responsibility is mixed, the question is "whether the government or the criminal defendant is more to blame." *Id.* (quoting *Doggett*, 505 U.S. at 651).[4]

*a. The government acted with reasonable diligence.*

Diligence turns on whether the government pursued the defendant reasonably under the circumstances. *Doggett*, 505 U.S. at 656; *United States v. Aguirre*, 994 F.2d 1454, 1456–57 (9th Cir. 1993). It does not require the government to take each and every possible action, nor "to make heroic efforts to apprehend a defendant," but is considered negligent if it "makes no serious effort" to find him. *Mendoza*, 530 F.3d at 763 (cleaned up). And "[i]f the government fulfills [its] obligation by pursuing a defendant with reasonable diligence, the defendant does not have a speedy trial claim." *Myers*, 930 F.3d at 1121 (citing *Doggett*, 505 U.S. at 656).

The government acted with reasonable diligence here. As the record shows, it moved to secure defendant's return within weeks of the indictment and never let up. It first pursued voluntary return—a reasonable course, given his counsel's representation that he "wishe[d] to face the U.S. charges head on"—and turned to extradition only when that failed. It then obtained an INTERPOL Red Notice, built an extradition request on a newly enacted St. Kitts extradition statute and the FSI, and moved the package through successive rounds of OIA review to a sworn request and defendant's provisional arrest.[5] At each stage, the government took concrete steps to bring defendant before this

[4] Defendant's motion does not claim that the government deliberately delayed to gain a tactical advantage or hamper his defense. Nor would such a claim have any basis in fact. As set forth below, the government pursued his appearance by two lawful avenues, applied for an INTERPOL Red Notice, and prepared a sworn extradition request that resulted in his arrest in St. Kitts.

[5] Based on conversations with OIA and its experience with submitting extradition requests to St. Kitts, the government reasonably believed that a formal request for

*(footnote cont'd on next page)*

Court; at none did it sit idle. That is reasonable diligence, and it defeats defendant's claim. *Mendoza*, 530 F.3d at 763.[6]

The cases finding government negligence are, unlike this one, marked by years of inaction. In *Mendoza*, on which defendant relies, the Ninth Circuit found government negligence over an eight-year delay where the case agent "made no effort to contact Mendoza to inform him that he had been indicted," and "the record [was] silent as to any efforts by the government to apprehend [defendant] beyond merely entering [defendant's] arrest warrant in the law enforcement database." 530 F.3d at 762–66; *see also United States v. Shell*, 974 F.2d 1035, 1035 (9th Cir. 1992) (negligence where for five of six years, the government misplaced defendant's file and made no attempt to arrest him); *Doggett*, 505 U.S. at 652–53 (negligence where for six out of an 8½-year delay, investigators "made no serious effort" to find a defendant "they could have found . . . within minutes").[7] Nothing of the sort happened here.

---

Bilzerian's extradition from St. Kitts in this fraud case based on St. Kitts' prior extradition law would have been unlikely to be fruitful. (Pang Decl. ¶ 12.) *See United States v. Corona-Verbera*, 509 F.3d 1105, 1114 (9th Cir. 2007) ("where our government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so"); *cf. In re Kashamu*, 769 F.3d 490, 494 (7th Cir. 2014) ("So we're not at all sure that the government ever must try to extradite a fugitive so as to protect his right to a speedy trial.")

[6] The record reflects no extended periods of unexplained delay of the type the Ninth Circuit attributed to the government in *United States v. Alexander*, 817 F.3d 1178, 1182–83 (9th Cir. 2016). In *Alexander*, the court found that the 9.6 months a prosecutor took to submit a draft extradition request weighed against the government—but only because that delay was left unexplained, the prosecutor having conceded she spent the time clearing unrelated matters. Moreover, notwithstanding this period of government negligence, the *Alexander* court affirmed the denial of the defendant's speedy trial motion.

[7] Defendant's motion cites three cases for the unremarkable proposition that delay is sometimes measured from indictment to arrest. (Dkt. 148 at 2.) But those decisions also underscore why defendant's claim fails. Each dismissed an indictment based on conditions that are absent here: an extraordinarily long delay caused by the government's own negligence, and a defendant who did not know he had been indicted. In each, the government possessed the means to find or reach the defendant but failed to make any serious effort to use the information it had. *See United States v. Espinoza-Ruelas*, 753 F.

*(footnote cont'd on next page)*

*United States v. Salzmann*, 548 F.2d 395 (2d Cir. 1978) is further afield still. That case arose under the Second Circuit's then-rule-based six-month "prompt disposition" deadline, not the constitutional *Barker* standard, and the court never reached the Sixth Amendment question. *Id.* at 397. And the government there conceded a lack of diligence: it had never told Salzmann, a draft offender who claimed he could not afford to return from abroad, that it would fund his transportation home. *Id.* Defendant reads that holding to require the government to obtain him a visa, equating a duty to fund an indigent's return with a duty to secure a visa. But the premise is false. Here, the government did not sit idle: it pursued voluntary return through counsel, obtained a Red Notice, and pursued extradition.

*b. Defendant bears responsibility for the delay*

Defendant's own conduct places responsibility for the delay on him. From the first contact in November 2024, he refused to unconditionally appear—insisting on an advance agreement for release on his own recognizance, continued residence in St. Kitts, and unrestricted travel in and out of the United States—and he refused even to complete a standard financial-disclosure form. That inverts the regular process, in which a judicial officer determines release only after the defendant appears. His refrain that the government "refused to facilitate" his entry is belied by the record: he conditioned his appearance on concessions he had no right to demand (March 2025), let the government's offer to facilitate his appearance go unanswered (October 2025), and refused outright when the government offered to bring him in without any visa at all (March 2026). Every barrier defendant identifies is one he erected.[8]

---

Supp. 3d 830, 839–43 (N.D. Cal. 2024) (nine years); *United States v. Gonzalez-Martinez*, 634 F. Supp. 3d 853, 863–69 (E.D. Cal. 2022) (77 months); *United States v. Flores-Vasquez*, 799 F. Supp. 3d 927, 933–34 (N.D. Cal. 2025) (five years). By contrast, defendant knew of the charges within weeks, and the government here attempted to secure defendant's appearance through voluntary return and extradition.

[8] Defendant's refrain that the government "never served" him with the indictment misapprehends criminal procedure. A criminal prosecution is not commenced or advanced by serving the charging instrument as occurs with a civil complaint. A warrant

*(footnote cont'd on next page)*

Delay of a defendant's own making is charged to him, not the government. A defendant "cannot avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States." *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995); *see also United States v. Sandoval*, 990 F.2d 481, 483 (9th Cir. 1993) (delay attributable to a defendant who "purposely absented himself from the proceedings"). So too here. The delay the defendant complains of is the delay he caused, first by refusing to appear except on his terms, and then by resisting the extradition that would deliver him to trial. As to that latter delay, he has waived the speedy-trial right he now invokes. *See Myers*, 930 F.3d at 1119.

Defendant's professed willingness to appear cannot be credited, because it does not match his conduct. He asks the Court to believe he wished to appear all along, but his willingness was conditioned at every turn, and he now litigates in St. Kitts to defeat extradition. Having forced the government to pursue his arrest through extradition and then set about to defeat it, defendant is the author of the delay he now invokes.

On either measure—the government's diligence or his own culpability—this factor weighs against defendant.

3. Defendant Did Not Genuinely Assert His Speedy Trial Right

The third *Barker* factor asks whether the defendant "asserted his right to a speedy trial." Here, defendant did not assert his speedy trial right until October 29, 2025 (Dkt. 141), nearly a year after learning of the indictment. And even then, his assertion was undercut by his own conduct. On the same day he filed his speedy trial demand and moved to compel the government to obtain a visa for him, the government offered "to

---

or summons issues upon the indictment, Fed. R. Crim. P. 9, and the case proceeds through the defendant's arrest and initial appearance, Fed. R. Crim. P. 5. The speedy-trial guarantees attach upon indictment or arrest, not upon "service." Moreover, it is beyond dispute that defendant had the notice that "service" would supply: his counsel was in contact with the government about the arrest warrant within weeks of the indictment (Pang Decl. ¶ 4 & Ex. 1), and he has litigated this case throughout. Finally, defendant was not "served" in the parallel SEC civil action either. Rather, his counsel executed a waiver of service on his behalf.

facilitate his transportation to the United States for his personal appearance at trial." That offer, made through counsel representing defendant in a related proceeding, went unanswered; thirteen days later, he filed this motion to dismiss instead.

A defendant's assertion, though "entitled to strong evidentiary weight," "must be viewed in the light of [his] other conduct." *United States v. Loud Hawk*, 474 U.S. 302, 314–15 (1986). As described above, defendant refused to return unconditionally, ignored the government's offers, and now resists the extradition that would bring him to trial. A defendant who demands a speedy trial while refusing every means offered to attend one has not asserted the right; he has manufactured a grievance.[9] This factor weighs against him.

4. <u>Defendant Cannot Show Prejudice</u>

The fourth *Barker* factor asks whether the delay prejudiced the defendant—that is, whether it harmed any of the three interests the speedy-trial right protects: freedom from "oppressive pretrial incarceration," relief from the "anxiety and concern of the accused," and, most serious, protection against "the possibility that the accused's defense will be impaired." *United States v. Tanh Huu Lam*, 251 F.3d 852, 859–60 (9th Cir. 2001) (cleaned up). Prejudice may be presumed in cases where the government's negligence causes a delay of extraordinary length; otherwise, the defendant bears the burden of showing actual prejudice. Defendant is entitled to no presumption and has shown no actual harm—and a defendant responsible for the delay who shows no prejudice has no speedy-trial claim. *See Barker*, 407 U.S. at 534. This factor weighs against him.

*a. No presumption of prejudice arises*

The court may presume prejudice strong enough to excuse the defendant from proving it only where (a) the government's negligence caused the delay and (b) the delay was extraordinarily long. *Doggett*, 505 U.S. at 656–58. Neither condition is met here.

---

[9] Defendant's then-counsel's assertion in November 2024 that defendant wished to face the charges, and his January 2025 application for a U.S. visa, do not shift the balance. An expression of willingness is not an assertion of the right when the speaker's conduct refutes it. *See Loud Hawk*, 474 U.S. at 314–15.

The government was not negligent. It pursued defendant's appearance with reasonable diligence, *see supra* Part III.B.2.a, and where the government is diligent, a speedy-trial claim fails "however great the delay." *Doggett*, 505 U.S. at 656; *see, e.g.*, *Corona-Verbera*, 509 F.3d at 1116 (declining to presume prejudice after 8.5 years of diligent effort); *Aguirre*, 994 F.2d at 1457–58 (no presumption despite five-year delay).

Nor was the delay extraordinary. In *Doggett*, the Supreme Court excused any showing of actual prejudice only because the government's negligence had caused a delay "six times as long as that generally sufficient to trigger judicial review"—8.5 years, six of them negligent—and the resulting presumption was neither extenuated by the defendant's acquiescence nor rebutted. *Id.* at 657–58. Following that lead, the Ninth Circuit has rarely presumed prejudice and only for delays of approximately five years or more. *Shell*, 974 F.2d at 1036 (five years of negligent delay); *Mendoza*, 530 F.3d at 764 (8.5-year delay attributed to government inaction).[10]

Even assuming the government were negligent for the entire period—which it was not—the presumption of prejudice from a delay of this length is not so strong as to excuse defendant from showing "particularized trial prejudice." *Doggett*, 505 U.S. at 657; *see United States v. Diaz Gonzalez*, No. 24-3951, 2025 WL 1794114, at *2 (9th Cir. June 30, 2025) (applying *Doggett* to reject presumption despite conceded periods of negligence). In cases involving similar or greater delays, the Ninth Circuit has required the defendant to prove actual prejudice. *See United States v. Krug*, 666 F. App'x 665, 667 (9th Cir. 2016) (a 34-month delay, 20 months of it government negligence, does not warrant dismissal absent a showing of prejudice); *United States v. Xue Cheng Dong*, 539 F. App'x 753, 754 (9th Cir. 2013) (rejecting the claim for a nearly 3-year delay wholly

---

[10] The district-court dismissals defendant cites are not to the contrary. *See supra* n.7. Each rested on a delay far longer than this one and on the government's own negligence—five years in *Flores-Vasquez*, 77 months in *Gonzalez-Martinez*, and nine years in *Espinoza-Ruelas*—confirming, rather than undercutting, that a delay will not result in dismissal absent both extraordinary length and government negligence, or a showing of actual prejudice.

attributable to government negligence); *Gregory*, 322 F.3d at 1162–63 (22-month negligent delay "not long enough to excuse [the defendant] from demonstrating actual prejudice"). A twenty-five-month delay is squarely in the range that requires a showing of prejudice, and nowhere near the range that excuses one. Defendant must therefore prove actual prejudice.

*b. Defendant fails to identify any actual prejudice*

Because no presumption applies, defendant must show actual, particularized prejudice—a burden that is especially heavy where, as here, the defendant is responsible for the delay. *Tanh Huu Lam*, 251 F.3d at 860; *Manning*, 56 F.3d at 1194.

Defendant falls far short of meeting that burden. He asserts only the "inherent prejudice" he says "certainly applies here": generalized anxiety and the possibility of faded memories. But he identifies no specific anxiety, no unavailable witness, no lost document, and no faded memory of any particular fact. Conclusory assertions of that kind do not establish actual prejudice. "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient," *Manning*, 56 F.3d at 1194, and a defendant's speculation about faded memories or lost evidence, without more, "amount[s] at most to speculation and fail[s] to demonstrate any actual prejudice," *Tanh Huu Lam*, 251 F.3d at 860. Were it otherwise, the "actual prejudice" requirement would mean nothing, and every defendant could satisfy it. Having offered no particulars in his motion, defendant should not be heard to supply them for the first time on reply.

Nor could defendant carry that burden if he tried. Defendant has never spent a day in U.S. custody, so there has been no oppressive pretrial incarceration; the only detention he has faced has been in St. Kitts—first on the government's extradition request, which he chose to resist, and now, it appears, on separate fraud charges pending against him there. (Pang Decl. ¶¶ 17–19.) He identifies no cognizable anxiety either—no symptom of any kind, let alone one traceable to the delay rather than to the charges themselves. *See Myers*, 930 F.3d at 1123. And he has not shown that his defense has been impaired: this is a documentary case, built on financial records, corporate filings, and email; such

evidence "does not rapidly dissipate or degrade" and can be retained almost indefinitely. *United States v. Rees*, 957 F.3d 761, 770 (7th Cir. 2020).

Defendant's only concrete assertion—that he has not had access to the discovery and so could not prepare for trial—does not identify prejudice of the kind the speedy-trial right protects against.[11] The impairment it guards against is the erosion of a defense by the passage of time: witnesses who become unavailable, memories that fade, evidence that is lost. Defendant's complaint is not that delay has degraded his defense, but that he has not been able to begin his preparation, having refused to appear and receive the discovery that appearance brings. The remedy for that is time to prepare once he appears, not dismissal.

In sum, a proper balancing of all the applicable *Barker* factors supports the conclusion that defendant's Sixth Amendment speedy-trial right was not violated. The total delay of which defendant complains is roughly twenty-five months—enough to trigger the *Barker* inquiry but not unduly long; the reason for the delay was his own doing, as his refusal to appear unconditionally forced the government to pursue his extradition from St. Kitts; defendant did not assert his right to a speedy trial until October 2025; and he can show no prejudice from the delay. Accordingly, his motion to dismiss the indictment should be denied.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny the Motion in its entirety.

[11] Despite defendant claiming that he had no access to discovery, counsel for the other defendants have represented to the government that they have exchanged communications and materials with him under a claimed joint defense agreement.